**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
HENRY VEGA,

                    Petitioner,

      - against -

JAMES WALSH,

                   Respondent.
-----------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**

06-CV-6492 (ARR) (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

Petitioner Henry Vega ("Vega"), who is incarcerated in New York after being convicted of second-degree murder and related offenses, seeks a writ of habeas. Docket Entry ("DE") 1. Vega first complains that he was deprived of a fair trial by the improper admission of evidence of uncharged crimes. Second, he asserts that the trial court denied his Sixth Amendment right to confront his accusers by admitting the testimony of a medical examiner who did not perform the autopsy about which she testified. Third, Vega argues that he was deprived of his right to equal protection of the law during jury selection when the trial court did not elicit from the prosecutor the race-neutral reasons for his exercise of several peremptory challenges, as required under the rule of *Batson v. Kentucky*, 476 U.S. 79 (1986). Upon a referral from the Honorable Allyne R. Ross, United States District Judge, DE 9, I now make my report and, for the reasons set forth below, respectfully recommend that the court deny the petition in its entirety.

I.    <u>Background</u>

    A.    <u>Facts</u>

Joseph Thomas "Tommy" Hill ("Hill") was killed in the early morning of November 5, 1996 in Kissena Park in Flushing, Queens. Hill was shot three times by a nine-millimeter handgun and robbed of approximately $400 to $600. Police later arrested Vega and co-defendant

Alfred Augugliaro ("Augugliaro") and charged each with two counts of second-degree murder as well as two additional counts of second- and third-degree criminal possession of a weapon. *See* DE 10 (state court record), Indictment;[1] *see* N.Y. Penal Law §§ 125.25(1)-(2), 265.02(4), 265.03(2).

The court severed the trials of the two defendants, and tried Vega twice in early 2002; the first trial resulted in a mistrial when the jury was unable to reach a verdict, and the second ended with Vega's conviction on one count of murder and both counts of weapons possession. *See* 1Tr. 3-23, 1307; 2Tr. 1263-64. At each trial the prosecutor relied primarily on the testimony of three fact witnesses – Holly Szamble ("Szamble"), Albert Andujar ("Andujar"), and Christopher Flores ("Flores") – in addition to forensic testimony by a medical examiner concerning the time and manner of Hill's death. I briefly summarize that evidence below, and defer to the discussion a more precise recitation of the facts relevant to each of the three claims in Vega's petition.

Szamble testified that in the latter half of 1996, while she was homeless and addicted to drugs, Vega allowed her to sleep in his apartment above the Bilmar Bar, which was located three blocks from Kissena Park in Queens, New York. During her stay, she observed that Vega, who was then 32 years old, received daily visits at his apartment from Augugliaro, who was then approximately 17 years old. Szamble sometimes saw the two men bagging cocaine together. 2Tr. 866-77, 904-06.

---

[1] The state court record, DE 10, also includes the following documents, among others: the transcript of Vega's first trial, conducted from January 3 through January 20, 2002, which did not produce a unanimous verdict ("1Tr."); the transcript of Vega's second trial, conducted from January 24 through February 7, 2002, which resulted in the conviction now at issue ("2Tr."), and Vega's brief on direct appeal ("App. Br.").

One day in early November 1996 (shortly after Szamble's birthday on the third of the month), Augugliaro came to the apartment between 11:00 and 11:30 p.m. and spoke with Vega outside of Szamble's presence for about ten minutes. Szamble then saw Vega take something from a drawer under his bed, put it under his shirt, and leave. Although Szamble did not see the item that Vega took from the drawer, she had often seen guns and gun-related magazines and videos in that same drawer. 2Tr. 879, 882-86, 907-08, 910, 916-17, 946.

When Vega returned to the apartment around 4:00 a.m., he said something about "Al [Augugliaro] breaking his cherry." 2Tr. 888. Later that morning, Augugliaro came over to the apartment and Vega told Szamble that he had "broken Al in, in the back of Kissena Park that night before," and that "Al had broken his cherry." 2Tr. 880-81. She later spoke with Augugliaro, who told her that he and Vega had been shooting guns in the back of Kissena Park. 2Tr. 934. At that time, Szamble did not know what Vega was talking about, and she remained unaware of Hill's murder when she related the statements to the police during an investigatory interview several years later. 2Tr. 893-900, 927.

Andujar testified that Vega was a friend with whom he sold drugs starting in approximately 1997. 2Tr. 734-37. In early 1997, Andujar had a conversation with Vega and Augugliaro in which Vega asked Andujar if he had heard of any homicides in Kissena Park. When Andujar said that he had, Vega told him that "one of them was mine" and related that he and Augugliaro had met a white man in front of the Bilmar Bar, walked him into the park, and Vega had shot him in the head because the man owed him money. 2Tr. 745-47. Andujar testified that he did not believe Vega's statement at the time. 2Tr. 750-51, 800.

Flores began selling drugs for Vega in early 1996, when he was 17 years old. He stated that Vega and Augugliaro sold drugs together at that time, and that Vega was "the boss." 2Tr. 956-59, 1000-02. Flores sold marijuana for Vega at his high school and in other areas of Queens. He reported to Augugliaro and gave the latter 60 percent of his earnings. 2Tr. 958-60, 1002-03. After Augugliaro went to jail for robbery in 1997, Flores began working directly for Vega, and the two men developed a closer relationship. In March 1999, Vega proposed that he and Flores carry out a "hit" on behalf of "suits," which Flores understood to mean members of organized crime. 2Tr. 971-72. Vega asked Flores whether he had ever committed a murder. Flores replied that he had not. Vega then explained "that I shouldn't worry ... that the first time ain't that bad[.]" Vega then told Flores that "once he went with Al [Augugliaro] to the Bilmar Bar. The guy came out, Tommy [Hill] and they offered him some coke to get in the car and they took him out to Kissena Park." Vega told Flores that he had killed Hill in Kissena Park, because Hill had "fucked up." Flores also testified that Vega had told him various things about committing murder: "he told me, it's funny how people walk to their own death ... he told me the head wounds are the worst wounds because you see blood and you see brain matter. He told me when the body is on the floor, to move back a couple of steps to shoot at the head and to be careful that blood wouldn't splatter on your clothes or on your boots." 2Tr. 974-75.

B.    Proceedings

Vega was sentenced as a second felony offender to a prison term of 25-years-to-life for murder, to be served concurrently with terms of fifteen and seven years, respectively, for the two weapons possession offenses. On direct appeal of his conviction, Vega raised each of the issues he now seeks to raise in this court. *See* App. Br. at 37-53, 61-68. The appellate court affirmed

the conviction on November 28, 2005.  *People v. Vega*, 805 N.Y.S.2d 642 (App. Div. 2005).

The New York Court of Appeals denied Vega's request for further review on April 21, 2006.

*People v. Vega*, 849 N.E.2d 983 (N.Y. 2006) (unpublished table decision).

Vega filed the instant petition, together with a supporting memorandum of law, on

December 6, 2006.  DE 1; DE 2 ("Memo.").  The respondent filed an opposing memorandum,

together with an affidavit, on April 6, 2007.  DE 6 ("Opp.").  The respondent also filed relevant

portions of the state court record on January 14, 2009.  DE 10.

While the matter was pending, the United States Supreme Court decided a case that

potentially affected the merits of Vega's Confrontation Clause claim.  *See Melendez-Diaz v.*

*Massachusetts*, 557 U.S. ----, 129 S. Ct. 2527, 2532 (2009).  I ordered the parties to submit

supplemental letter-briefs as to the extent, if any, to which *Melendez-Diaz* affects the merits of

Vega's petition.  *See* DE 11 (minute entry for telephone conference of July 22, 2009).  In

addition, I concluded that the court would benefit from a hearing to determine the prosecutor's

reasons for the peremptory challenges at issue in Vega's *Batson* claim.  *See id.*; DE 14 (minute

entry for telephone conference of September 25, 2009).  I conducted such a hearing on October

20, 2009.  DE 24 (minute entry); DE 26 (transcript of hearing) ("HT").  Following the hearing,

the parties submitted supplemental briefing on both the Confrontation Clause issue and the

*Batson* issue.  DE 27 (Vega) ("Supp. Memo."); DE 30 (respondent) ("Supp. Opp.").

II.    Discussion

        A.    Threshold Procedural Issues

Vega filed his petition less than one year after the completion of direct appellate review in

the state courts.  The petition is therefore timely.  *See* 28 U.S.C. § 2244(d)(1)(A).  Having

presented on direct appeal of his conviction each of the claims on which he now seeks habeas

relief, Vega has also satisfied the exhaustion requirement of the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA").  *See Daye v. Attorney General*, 696 F.2d 186, 191 (2d

Cir. 1982) (en banc); *see* App. Br. at 37-40, 37-53, 61-68.  Finally, the record plainly reveals that

each of Vega's claims implicates the federal Constitution and that each such claim was reviewed

in state court and either explicitly rejected on the merits or, at a minimum, not explicitly decided

on an "independent and adequate state ground."  *Coleman v. Thompson*, 501 U.S. 722, 729

(1991); *see Harris v. Reed*, 489 U.S. 255, 261-62 (1989); *Degrijze v. Artuz*, 134 Fed. Appx. 460,

461 (2d Cir. 2005); *Vega*, 805 N.Y.S.2d at 642-43.[2]  Accordingly, this court has jurisdiction to

consider all of Vega's claims on the merits.

A federal habeas court may grant relief on a claim that was decided by the state court on

the merits only if it concludes that the adjudication of the claim resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established federal law as

determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d)(1).  A state court

decision is "contrary to" Supreme Court precedent if it applies a legal rule that contradicts a rule

set out in governing Supreme Court cases, or if it addresses a set of facts that are materially

---

[2]  The appellate court explicitly rejected on the merits both Vega's complaint about the admission
of drug-trafficking evidence and his *Batson* challenge. *Vega*, 805 N.Y.S.2d at 642, 643.  It
rejected Vega's remaining appellate claims by describing them as "either unpreserved for
appellate review or without merit."  *Id*. at 642.  Although the prosecution argued that at least
some of Vega's claims were not properly preserved for appellate review, the court did not
explicitly rule on that basis.  There is thus no procedural bar, and the respondent makes no
argument to the contrary.  *See Tankleff v. Senkowski*, 135 F.3d 235, 247 (2d Cir. 1998) ("a
procedural default does not bar consideration of a federal claim on habeas review unless the last
state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests
on a state procedural bar") (quoting *Coleman*, 501 U.S. at 735); Opp. at 69.

indistinguishable from those in a Supreme Court case and reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision is an "unreasonable application" of Supreme Court precedent if it identifies the correct legal rule but unreasonably applies it to the facts of a particular case, or if it makes an unreasonable decision about whether to extend existing Supreme Court precedent to a new context. *Id.* at 407. Habeas relief is unavailable unless the trial court's decision was "so plainly unconstitutional that it was objectively unreasonable" for the appellate court to affirm. *Jimenez v. Walker*, 458 F.3d 130, 147 (2d Cir. 2006) (citing *Williams*, 529 U.S. at 409-10, 412).

With respect to any issue properly raised in a habeas petition that the state court did not determine on the merits, the deferential standard prescribed under AEDPA is inappropriate. *Wiggins v. State*, 539 U.S. 510, 531 (2003) (applying *de novo* standard of review to part of federal claim not reached by state court); *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2001) (applying *de novo* standard where it was "impossible to discern the Appellate Division's conclusion" on issue); *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir. 2001) (giving no AEDPA deference where petitioner's constitutional claim not adjudicated on the merits); *cf. Jimenez*, 458 F.3d at 143 (noting that decision may still be "on the merits" where state court did not articulate its reasons for adjudicating the claim as it did).

B.    Evidence Of Uncharged Crimes

Vega claims that the trial court improperly admitted evidence of his prior conduct involving narcotics trafficking, weapons possession, and the solicitation of a murder, as well as evidence about a tattoo of the word "enforcer" on his body. He complains that such evidence

impermissibly tended to demonstrate his propensity to commit crimes and therefore deprived him of his right to a fair trial. Memo. at 35. As explained below, I disagree.

1.   Background

Before the start of Vega's first trial, the prosecutor made an application pursuant to state law to present certain evidence of uncharged criminal conduct in which Vega had participated. *See People v. Molineux*, 168 N.Y. 264, 293-94 (1901) (evidence of uncharged crimes is generally inadmissible under New York law except when probative of a material element of a charged offense); *People v. Ventimiglia*, 52 N.Y.2d 350, 359 (1981) (evidence of prior crime admissible when probative value of evidence outweighs potential for prejudice). First, the prosecutor sought to prove that Vega was in the business of distributing marijuana and cocaine; that co-defendant Augugliaro worked for Vega selling drugs; that Vega sold drugs to victim Hill; and that Hill had accumulated a debt to Vega. The prosecutor argued that such evidence would demonstrate both a motive for Vega to kill Hill and a reason for Vega to have confessed the murder to certain witnesses. 1Tr. 25-26. Pursuant to the court's pretrial ruling, 1Tr. 119, the prosecutor adduced this evidence through the testimony of witnesses Szamble, Andujar, and Flores.[3]

Second, the prosecutor applied to introduce evidence of an undercover police sting operation in which sham organized crime figures solicited Vega to participate in a "hit." Specifically, the prosecutor sought to prove that Vega agreed to commit the murder and recruited witness Christopher Flores to assist him in the execution, and argued that such evidence would help explain why Vega would confess to Flores his involvement in the charged murder of Hill.

---

[3]   Rather than conduct new evidentiary hearings in advance of Vega's second trial, the court adhered to the "major evidentiary rulings made in the previous trial[,]" 2Tr. 2-3, and agreed to deem Vega's objections to those rulings to have been made in the second trial as well. 2Tr. 4.

1Tr. 36-39. Pursuant to the court's pretrial ruling, 1Tr. 119, Flores testified about an episode in April 1999, when Vega called Flores and told him to meet him at a restaurant. When Flores arrived, Vega was sitting at a table with three men. Vega told Flores that the men were "mafioso." 2Tr. 978. Vega, Flores, and the three men discussed a proposed "hit" on a man named Eric who was "hustling [drugs] around the neighborhood" and who "was making a fool of me [Flores] and Henry [Vega]." 2Tr. 979. Vega had previously mentioned to Flores that he wanted to get money from Eric because Eric was selling drugs in Vega's and Flores's area. 2Tr. 979. Unbeknownst to Vega, Flores and Eric were friends from high school, and Flores told Eric about the proposed "hit." 2Tr. 980. Flores later told Vega that he did not want to be involved. Vega reacted by punching a wall and throwing Flores out of his apartment. 2Tr. 1048-51, 1072.

Finally, the prosecutor offered evidence that Vega possessed handguns and instructional manuals, and sought to prove that Vega kept the weapons in a particular part of his apartment and that he was observed going into that area, removing something, and putting it in his belt around the time of the homicide. The prosecutor argued that the evidence permitted an inference that Vega had retrieved a handgun and therefore had an opportunity to commit the charged murder. 1Tr. 40-42. Pursuant to the court's pretrial ruling, the prosecutor elicited testimony about the guns from Szamble.[4]

In addition to the evidence of uncharged crimes that the trial court admitted after a pretrial *Molineux* hearing, Vega complains about the admission of Flores's testimony about his tattoo. Specifically, Flores testified that Vega had the word "enforcer" tattooed on his abdomen,

---

[4] The prosecution originally offered to introduce evidence that Vega possessed a silencer, but withdrew that part of its request in response to the court's concern that such evidence might be unduly prejudicial. 1Tr. 119-21.

and the prosecutor introduced a photograph of that tattoo.  2Tr. 995-97.  When Vega objected to

such evidence at his first trial, 1Tr. 1017, the prosecutor argued that Vega was "basically

advertising, a billboard, if you would, of his job or his role as an enforcer, and also it is in line

with his testimony that ... he murdered Tommy Hill because Tommy Hill, excuse my language,

fucked up[.]"  1Tr. 1018.  The court admitted the evidence at the first trial, 1Tr. 1019, and then

again, over Vega's renewed objection, at the second.  2Tr. 997.

2.    Analysis

To determine whether there has been a constitutional violation, the court must consider

whether the evidentiary rulings were proper under state law, and if not, whether the error

deprived petitioner of a fundamentally fair trial.  *See, e.g., Dey v. Scully*, 952 F. Supp. 957, 969

(E.D.N.Y. 1997).  Under New York state law, evidence of prior bad acts may not be introduced

for the purpose of showing defendant's propensity to commit the crime charged, but it has long

been admitted for other purposes, including to show intent or lack of mistake.  *Nowlin v. Greene*,

467 F. Supp. 2d 375, 380 (S.D.N.Y. 2006) (citations omitted).  Even if Vega can show, however,

that this evidence was improperly admitted to prove his propensity to commit the charged crime,

he would not be entitled to relief because the admission of such evidence does not violate

"clearly established federal law, as determined by the Supreme Court of the United States."  28

U.S.C. § 2254(d)(1).  The Supreme Court has never held that the admission of evidence of prior

crimes to show propensity constitutes a deprivation of due process.  *See Estelle v. McGuire*, 502

U.S. 62, 75 n.5 (1991) ("we express no opinion on whether a state law would violate the Due

Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a

charged crime"); *Spencer v. Texas*, 385 U.S. 554, 572-74 (1967) (Warren, C.J., concurring in part

and dissenting in part) (the Supreme Court "has never held that the use of prior convictions to show nothing more than a disposition to commit crime would violate the Due Process Clause of the Fourteenth Amendment," but expressing belief that such use would violate due process); *see Allaway v. McGinnis*, 301 F. Supp. 2d 297, 300 (S.D.N.Y. 2004) (acknowledging that "the Supreme Court has not clearly established when the admission of evidence of prior crimes under state evidentiary laws can constitute a federal due process violation").

Not all erroneous admissions of evidence rise to the level of a due process violation. *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998). The court's task is to determine whether the evidence was "so extremely unfair that its admission violates fundamental conceptions of justice." *Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). The court must not grant the writ unless the admitted evidence, "viewed objectively in the light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been 'crucial, critical, highly significant[.]'" *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (quoting *Nettles v. Wainwright*, 677 F.2d 410, 414-15 (5th Cir. 1982)).

Vega is plainly entitled to no relief with respect to the admission of evidence of his drug-trafficking or his possession of handguns: as the prosecutor correctly argued and the trial court recognized, such evidence was relevant to prove Vega's motive and opportunity for committing the charged murder of Hill, and also served to explain why Vega would confess his participation in that murder to witnesses Andujar and Flores. *See United States v. Araujo*, 79 F.3d 7, 8 (2d Cir. 1996) (defendant's statement to government witness that she had been a drug courier admissible to demonstrate trust relationship between witness and defendant); *Bossett v. Walker*,

41 F.3d 825, 829-30 (2d Cir. 1994) (prosecutor's references to drug-dealing were not prejudicial because evidence of drug activity could have been admitted to establish motive); *United States v. Robinson*, 560 F.2d 507, 513 (2d Cir. 1977) (evidence that defendant had gun admissible because it tended to show he had opportunity to commit crime); *Young v. McGinnis*, 411 F. Supp. 2d 278, 304-05 (E.D.N.Y. 2006) (evidence of prior crime admissible to show motive for homicide); *United States v. Slaughter*, 2004 WL 856323, at *1 (S.D.N.Y. Apr. 20, 2004) (evidence of prior gun possessions admissible to prove opportunity, preparation, and plan).

The evidence of Vega's attempt to recruit Flores to participate in a bogus mafia "hit" is a closer call because the similarity of the uncharged crime to the murder for which Vega stood trial increased the likelihood of unfair prejudice: the intended victim was purportedly involved in the drug trade and Vega believed that he owed Vega money and had made a fool of him. Although evidence of similar uncharged crimes has probative value, under New York law it is generally excluded for policy reasons "because it may induce the jury to base a finding of guilt on collateral matters or to convict a defendant because of his past." *Gersten v. Senkowski*, 299 F. Supp. 2d 84, 102 (E.D.N.Y. 2004) (quoting *People v. Alvino*, 519 N.E.2d 808, 812 (1987)). Such evidence may be received, however, "if it helps to establish some element of the crime under consideration or is relevant because of some recognized exception to the general rule." *Id*. Despite the risk of prejudice, the trial court plainly had the discretion to admit the evidence to allow the jury to assess Flores's testimony about Vega's statements concerning the murder of Hill. Moreover, the trial court's charge sufficiently explained that the jury must not consider Vega's past acts as proof of propensity, but rather only to establish "the relationship between the defendant and witnesses

who testified concerning certain admissions of guilt ...." 2Tr. 1232.  *See Allaway*, 301 F. Supp. 2d at 301.

Less persuasive is the respondent's attempt to justify the admission of evidence about Vega's "enforcer" tattoo.  The contention that the evidence was admitted to establish "the close relationship between petitioner and Flores and to help explain Flores's fear of petitioner and his reluctance to tell petitioner that he did not want to participate in the 'hit[,]'" Opp. at 41, appears nowhere in the trial transcript, and smacks of *post hoc* rationalization.  Nor is it apparent that Flores's knowledge of the tattoo inherently conveyed information about the intimacy of his relationship with Vega.  In any event, because other evidence established both the nature of the relationship and the reasons for Flores to fear Vega – including Vega's statement about murdering Hill and his attempt to recruit Flores for another murder – there was no need to risk further prejudice by admitting the thoroughly uninformative evidence of Vega's inflammatory tattoo.  However, although I am not persuaded that the evidence should have been admitted, I do not conclude that the evidentiary ruling clears the very high bar that AEDPA erects to securing collateral relief.  There is certainly no reason to conclude that the evidence  "was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it."  *Collins*, 755 F.2d at 19.

Even if evidence of the tattoo – or any of the other evidence Vega challenges here – should not have been admitted, the court must assess its impact "in light of the entire record before the jury."  *Dunnigan*, 137 F.3d at 125 (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)).  That record included evidence that Vega had twice confessed to Hill's murder to two separate witnesses, evidence that Szamble had seen Vega return to his room to get what was

likely a gun at around the time of the murder, and evidence that Vega had told Szamble the following day that he had broken Augugliaro's "cherry" – in circumstances strongly suggesting he was referring to murder – in the precise area where Hill's corpse was discovered. Moreover, the content of Vega's admissions to the witnesses – including his descriptions of how and where he fired the gun and his statement about providing cocaine to Hill before killing him – were corroborated by the medical examiner's testimony. *See* 2Tr. 745-47, 880-81, 974-75, 1090-93, 1095-96, 1103. In light of the ample evidence before the jury, I conclude that the challenged evidence, while significant, was not enough to provide a basis for conviction, or to remove a reasonable doubt that would otherwise have existed. Its admission was not so unfair as to violate fundamental conceptions of justice. *See Dunnigan*, 137 F.3d at 125. I therefore respectfully recommend that the court deny this portion of Vega's habeas corpus petition.

    C.    <u>Confrontation</u>

        1.    <u>Background</u>

Vega's Confrontation Clause claim relates to the testimony by Dr. Kari Reiber ("Reiber") concerning the results of an autopsy she did not perform. *See* Memo. at 60; 2Tr. 1074.[5] Another examiner, Dr. George Sterbenz ("Sterbenz"), had conducted the autopsy of Hill's body, but he had left the medical examiner's office and moved to California by the time of Vega's trial. 2Tr. 1079; 1Tr. 1068. The prosecutor therefore elicited from Reiber conclusions that she reached based on Sterbenz's autopsy report. 2Tr. 1079-81. Vega asserts that the admission of Reiber's

---

[5] Vega raised additional confrontation claims on direct appeal of his conviction. *See* App. Br. at 53-64. Because Vega was represented by counsel both on appeal and in this habeas action, the court need not assume that Vega intends to press those other claims here. *Cf. Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (requiring liberal construction of a *pro se* litigant's habeas petition). I therefore recommend that the court treat such claims as abandoned.

testimony violated his Sixth Amendment right to confront his accusers. *See* Supp. Memo. at 19; *Crawford v. Washington*, 541 U.S. 36, 68 (2004); *Melendez-Diaz*, 129 S. Ct. at 2532.

Sterbenz's report was not admitted in evidence. However, the prosecutor was allowed to introduce a "body diagram" – apparently recording Sterbenz's observations – charting Hill's wounds, including the spots where the bullets entered and their trajectory within his body. 2Tr. 1082-83 (describing the diagram as a "paper that is used at the time of the autopsy to record all the findings"). Reiber also testified about certain photographs: she asserted that one of them had been taken at the crime scene (without explanation of how she knew that to be the case), but she did not mention the provenance of three others. *See* 2Tr. 1088-90.

Reiber testified that Hill had sustained two gunshots to the head and one to the torso, and opined that each was independently fatal. 2Tr. 1080-81, 1087. She further opined, based on the amount of accumulated blood in Hill's chest cavity, that Hill was still alive when he was shot in the torso. 2Tr. 1090. In addition, the absence of gunpowder residue on the body led Reiber to conclude that Hill's assailant fired from more than one-and-a-half to two feet away. 2Tr. 1092-94. Reiber testified that Hill had both alcohol and cocaine in his blood, and that he had likely ingested cocaine within hours of his death. 2Tr. 1095-96, 1103. The rigidity and temperature of Hill's body suggested to Reiber that Hill died between 1:00 a.m. and 3:00 a.m. 2Tr. 1100-01.

2.    Analysis

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ...." U.S. Const. amend. VI. A foundational component of this guarantee is the right of a criminal defendant to cross-examine

the prosecution's witnesses. *Cotto v. Herbert*, 331 F.3d 217, 229 (2d Cir. 2003) (citing *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)).

When Vega was tried in 2002, the authoritative interpretation of the Confrontation Clause was the Supreme Court's decision in *Ohio v. Roberts*, 448 U.S. 56 (1980). Under *Roberts*, the statement of a witness who was unavailable for cross-examination would be admitted if the statement bore adequate "indicia of reliability." *Id.* at 66. In order to meet this test, the evidence had to either fall within a firmly rooted hearsay exception or bear other guarantees of trustworthiness. *Id.*; *Lilly v. Virginia*, 527 U.S. 116, 124-25 (1999). The Supreme Court later abandoned that standard in *Crawford*, holding that the Sixth Amendment guarantees a defendant the right to confront those who "bear testimony" against him. 541 U.S. at 51.

*Crawford* announced a *per se* bar on the admission of "testimonial" out-of-court statements. *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006) (citing *Crawford*, 541 U.S. at 59).[6] While the Court declined to provide an exhaustive list of such testimonial statements, it did describe a "core class" of such evidence. *Crawford*, 541 U.S. at 51. "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Id.* at 68. Crawford's *per se* bar applies to statements that fall within hearsay exceptions. *United States v. Saget*, 377 F.3d 223, 226 (2d Cir. 2004) (citing *id.* at 68-69).

---

[6] *Crawford* recognizes an exception, not pertinent here, where the declarant is unavailable but has previously been subject to the defendant's cross-examination. 541 U.S. at 68.

After *Crawford*, federal courts set about defining the contours of the class of "testimonial" statements. Of particular relevance here, several courts – including the United States Court of Appeals for the Second Circuit – determined that an autopsy report is not "testimonial" within the meaning of *Crawford*, and that as a result, a medical examiner may testify about the results of an autopsy performed by another without offending the Confrontation Clause. *Feliz*, 467 F.3d at 229, 236-37; *see*, *e.g.*, *United States v. De La Cruz*, 514 F.3d 121, 134 (1st Cir. 2008). To the extent *Feliz* remains controlling law in this circuit, Vega's confrontation claim must be rejected. *See*, *e.g.*, *United States v. James*, 2007 WL 2702449, at *1 (E.D.N.Y. Sept. 12, 2007) (toxicology report not testimonial); *Clarke v. Goord*, 2007 WL 2324965, at *6 (E.D.N.Y. Aug. 10, 2007*) (autopsy report not testimonial).

The continued viability of *Feliz* was called into question in 2009, however, when the Supreme Court held in *Melendez-Diaz* that "certificates of analysis," offered by the prosecution as evidence of the nature and quantity of suspected narcotics in the trial of a defendant charged with drug trafficking, fell within the "core class of testimonial statements" that a defendant is constitutionally entitled to confront. 129 S. Ct. at 2532 (internal citation omitted).[7] The question

---

[7] In *Briscoe v. Virginia*, 129 S. Ct. 2858 (2009), the Supreme Court granted certiorari to review the constitutionality of a state statute that permitted the prosecution to introduce a forensic laboratory report without presenting the testimony of the analyst who prepared the certificate while providing the defendant a right to call the analyst as its own witness. *See Magruder v. Commonwealth*, 657 S.E.2d 113 (Va. 2008). Although the case raised the possibility of a clarification of the "testimonial" standard that would affect the analysis here, the Supreme Court ultimately vacated the judgment in *Magruder* and, without further comment, remanded the case "for further proceedings not inconsistent with" *Melendez-Diaz*. *Briscoe v. Virginia*, 130 S. Ct. 1316, 1316 (2010).

thus becomes whether *Melendez-Diaz* – which was decided after Vega's conviction but while his habeas petition was pending – applies retroactively to this case.[8]

One judge of this court has recently determined that *Melendez-Diaz* does not apply retroactively. *Brewster v. People*, 2010 WL 317919, *6 n.3 (E.D.N.Y. Jan. 21, 2010) (citing *Louder v. Coleman*, 2009 WL 4893193, at *5 (W.D. Pa. Dec. 10, 2009)). However, the footnote in *Brewster* did not explain that conclusion, and the United States Court of Appeals for this circuit has not yet addressed the question. I therefore provide my own analysis below.

Vega is entitled to retroactive application of *Melendez-Diaz* only if the case articulated a rule already in existence at the time of Vega's conviction, or if it announced a new "substantive"

---

[8]  If the court concludes that *Melendez-Diaz* does apply retroactively, it must then determine whether *Melendez-Diaz* requires it to disregard *Feliz* and grant Vega relief. I believe it does not. Although *Melendez-Diaz* is unquestionably in tension – and probably irreconcilable – with *Feliz*, it neither explicitly overruled the latter case nor made its holding untenable. As a result, even if the court concludes (as I do) that applying the rule of *Melendez-Diaz* would forbid the admission of Reiber's testimony, it must nevertheless apply *Feliz* unless and until a higher court explicitly reaches that same conclusion. *See, e.g. Unicorn Bulk Traders Ltd. v. Fortune Mar. Enters., Inc.*, 2009 WL 125751, at *2 (S.D.N.Y. Jan. 20, 2009) (district court "is bound to follow controlling Second Circuit precedent unless that precedent is overruled or reversed") (citing *United States v. Emmenegger,* 329 F. Supp. 2d 416, 436 (S.D.N.Y. 2004) (district court is "obliged to follow ... [binding circuit case law] until it is overruled by a higher court or until the Supreme Court renders it untenable"); *Bass v. Coughlin*, 800 F. Supp. 1066, 1071 (N.D.N.Y. 1991) ("When the Court of Appeals announces a principle of law for this circuit, it remains the law until the case is overruled or reversed.")); *cf. State Oil*, 522 U.S. at 20 (even where a prior Supreme Court decision is "aptly" described as having "infirmities" and "moth-eaten foundations," it "deserves continuing respect under the doctrine of *stare decisis*" because "it is [the Supreme] Court's prerogative alone to overrule one of its precedents"). Accordingly, although I believe *Melendez-Diaz* should not be applied retroactively, a contrary conclusion would not alter my recommendation that the court should deny Vega's petition. Moreover, in light of the overwhelming evidence provided by fact witnesses including Szamble, Andujar, and Flores, I would find that any error in admitting Reiber's testimony was harmless and therefore not a sufficient basis for granting habeas relief. *Kotler v. Woods*, 620 F. Supp. 2d 366, 394 (E.D.N.Y. 2009) (applying harmless error standard to potential *Crawford* violation).

rule or a new "watershed" rule that implicates "the fundamental fairness and accuracy of the criminal proceeding." *Saffle v. Parks*, 494 U.S. 484, 495 (1990) (quoting *Teague v. Lane*, 489 U.S. 288, 311 (1989)). On the other hand, if *Melendez-Diaz* did not announce a new "watershed" rule, it will not apply retroactively. *See Whorton v. Bockting*, 549 U.S. 406, 418-19 (2007) (holding that *Crawford* rule is new procedural rule but not watershed).

In order to determine whether a rule is new, the court must "assay the legal landscape" at the time the conviction became final and ask whether the rule later announced was "dictated by then-existing precedent – whether, that is, the unlawfulness of [the defendant's] conviction was apparent to all reasonable jurists." *Beard v. Banks*, 542 U.S. 406, 413 (2004) (citation omitted). When a case explicitly overrules an earlier holding, it clearly creates a new rule. *See Saffle*, 494 U.S. at 488. It is less clear, however, when a decision extends the reasoning of prior cases. *Id.*

Although the Supreme Court characterized its decision in *Melendez-Diaz* as a "straightforward application of ... *Crawford*," 129 S. Ct. at 2533, the ruling was by no means "apparent to all reasonable jurists." *See id*. at 2543 (Kennedy, J., dissenting) (asserting, on behalf of four Justices, that the majority's decision "sweeps away an accepted rule governing the admission of scientific evidence" and "undoes" precedent that "has been established for at least 90 years" on the basis of "two recent opinions that say nothing about forensic analysts"). However strong the argument may be that the *reasoning* in *Crawford* compelled the result in *Melendez-Diaz*, the latter decision plainly announced a rule that was new.[9]

_____

[9]  The fact that *Crawford* itself announced a new rule would be fatal to Vega's claim if his conviction had been finalized before that case was decided. But although Vega was tried and sentenced before the Supreme Court decided *Crawford*, he did not exhaust his state appellate remedies until after the opinion was issued. *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) (a new rule relating to the conduct of criminal prosecutions is applied retroactively to all cases,

In addition to being new, the rule announced in *Melendez-Diaz* was also procedural rather than substantive. *See Crawford*, 541 U.S. at 61 (the Confrontation Clause "is a procedural rather than a substantive guarantee") (quoted in *Whorton*, 549 U.S. at 414). It therefore does not apply retroactively to Vega's petition unless it can be considered a "watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Whorton*, 549 U.S. at 416. The Court has applied the latter standard "extremely narrow[ly]." *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004). Indeed, in the twenty years since the Supreme Court established the *Teague* framework for determining the retroactivity of judge-made criminal rules, it has not found a single rule to satisfy the requirements for watershed status. *See Whorton*, 549 U.S. at 418 (collecting cases).

A "watershed" rule is one necessary to prevent "an impermissibly large risk of an inaccurate conviction ... and the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Id.* (internal citations omitted). Because the Supreme Court itself described *Melendez-Diaz* as a "straightforward application" of *Crawford*, it necessarily follows that if *Crawford* did not constitute a watershed event in the development of criminal procedural law – as it did not, *see Whorton*, 549 U.S. at 420 – *Melendez-Diaz* cannot have done so either. *See Louder*, 2009 WL 4893193, at *5 (noting that the Supreme Court has not made either *Crawford* or *Melendez-Diaz* retroactively applicable); *Carillo v. United States*, 2009 WL 4675798, at *2 n.1 (N.D. Ill. Dec. 3, 2009) ("even if *Melendez-Diaz* were applicable to this case, it would not apply retroactively"); *Frankenberry v. Coleman*, 2009 WL 3734140, at *5 (W.D. Pa. Nov. 6, 2009) (finding that "just as *Crawford* does not apply retroactively to cases on

_____

state or federal, pending on direct review or not yet final).

collateral review, the asserted expansion of *Crawford* in *Melendez-Diaz* cannot apply

retroactively to cases on collateral review"); *Larkin v. Yates*, 2009 WL 2049991, at *2 (C.D. Cal.

July 9, 2009) (assuming without deciding that *Melendez-Diaz* announced a new rule of law but

not a watershed rule).  I therefore conclude that *Melendez-Diaz* does not apply retroactively and

that the court should therefore reject Vega's Confrontation Clause claim.

      D.     *Batson*

      The Supreme Court held in *Batson* that a prosecutor's racial discrimination in exercising

peremptory challenges during jury selection in a state court trial violates the Equal Protection

Clause of the Fourteenth Amendment to the Constitution.  When a defendant asserts that a

prosecutor's strike runs afoul of the Equal Protection Clause, a court must evaluate that objection

in three stages.

> First, the defendant must make out a *prima facie* case by showing that the totality
> of the relevant facts gives rise to an inference of discriminatory purpose.  Second,
> once the defendant has made out a *prima facie* case, the burden shifts to the State
> to explain adequately the racial exclusion by offering permissible race-neutral
> justifications for the strikes. Third, if a race-neutral explanation is tendered, the
> trial court must then decide ... whether the opponent of the strike has proved
> purposeful racial discrimination.

*Johnson v. California,* 545 U.S. 162, 168 (2005) (internal quotations, citations, and alteration

omitted).

      Vega claims that the trial court violated the rule of *Batson*.  He contends that he fulfilled

his obligation at the first stage of the *Batson* inquiry by making a *prima facie* showing of

discrimination but that the trial court erroneously failed to require the prosecutor to explain his

strikes of several African-American prospective jurors, and instead improperly substituted its

own conjecture to justify those strikes.  *See* Memo. at 54.  After reviewing the record, I agreed,

for the reasons set forth below.  I therefore convened a reconstruction hearing to complete the record and to consider the prosecutor's explanations for the strikes.  Having heard those explanations and then considered the parties' post-hearing submissions, I conclude for the reasons that follow that regardless of any error at trial, the prosecutor's strikes were made for non-pretextual, race-neutral reasons, and therefore did not run afoul of the Constitution.

      1.    <u>Background</u>

The trial court conducted jury selection in a series of "rounds," during which each party was free to exercise peremptory challenges.  In the first such round, prosecutor Brad Leventhal ("Leventhal") struck James Polk ("Polk"), Jennifer Jackson ("Jackson"), and Antonio Roldan ("Roldan"); Polk and Jackson are African-American, 2Tr. 374, and the trial judge described Roldan as a "male Hispanic," not "primarily of African heritage." 2Tr. 374-75, 378.  In the second round, Leventhal struck Alise Francisco ("Francisco"), Tammy Holland  ("Holland"), Anthony Gannuscio ("Gannuscio"), and Adam Profit ("Profit"); Gannuscio is white and the other three African-American.  2Tr. 227, 374-75.  In the third round, Leventhal initially struck Paul Parades, Joy Dorleans ("Dorleans"), Joan Roldan, and Kathy Armstrong ("Armstrong") before Vega first complained of a *Batson* violation; Dorleans and Armstrong are both African-American and the other two are not.  2Tr. 373, 374-75.

In making his initial *Batson* challenge, Vega's trial counsel, Jonathan Latimer ("Latimer"), expressed concern over the striking of "[p]eople of African heritage," 2Tr. 373-74, and asserted that such persons accounted for about 25 percent of the venire.  2Tr. 517.  At the court's request, Latimer presented his *prima facie* case, stating that the prosecutor had struck six

African-Americans in his first seven challenges, and eight in the eleven challenges they had exercised thus far.  2Tr. 374-75.

The trial judge responded to that presentation by asking, "aside from just numbers, is there anything else here to suggest a violation of equal protection?"  2Tr. 375.  Latimer answered that with respect to five of the struck jurors, Polk, Jackson, Roldan, Francisco, and Profit, there was no reason to believe that they would not be fair and impartial.  He further noted that Roldan had indicated approval of "one of the star points of the Prosecution's case":  the use of informant testimony.  He also cited both Francisco's statement in which she noted her approval of the use of informants because people likely to have knowledge of criminal activity are the ones involved in it, and the prosecution's characterization of her response to the other jurors as an excellent answer to that question.  2Tr. 375-76.  Latimer further stated his belief that there was no race-neutral reason to challenge Armstrong because, while she initially expressed a negative view of the use of informants, she later stated that she would use the fact that a witness was receiving a benefit for testifying as a factor to weigh when determining the witness's credibility, consistent with the anticipated jury instructions.  2Tr. 376.

The trial judge then asked the prosecutor to address whether Vega had made a *prima facie* showing of a *Batson* violation.  The prosecutor first asserted that each stricken juror had been "excused for a non-racial reason" before responding to the court's question by opining, "I don't believe that the Defense has stated a *prima facie* case that would require me to elicit those non-racial reasons as a *prima facie* case."  The prosecutor went on to question whether Roldan fit within the category of "persons of African heritage."  2Tr. 377-78.

The record is thus clear that, at this point in the proceedings, the trial judge did not know the actual reason for any of the prosecutor's strikes – he knew only that the prosecutor had characterized those reasons as "non-racial[.]" The judge nevertheless stated, "in response to some of the arguments made by the defense," that there were race-neutral reasons supporting several of the strikes at issue. 2Tr. 378. For example, the judge noted that Armstrong "seemed to indicate to this Court in a strident fashion that she did not approve of witnesses who received a benefit[.]" The judge similarly noted that he had "made some observation of [Francisco] regarding lack of acuteness, for want of a better word. She just seemed to be a little distant." After making these observations, the judge concluded, "I can't find here that there is a *Batson* violation. A *prima facie* case has not ... been made based on the arguments that I have heard. I don't see a pattern arising here indicating equal protection concerns." 2Tr. 379.

Latimer then pointed out that no race-neutral reason had yet been provided for the prosecutor's decision to strike Profit. The trial judge initially responded by saying, "Well, I am not requiring a race-neutral reason." Moments later, however, the judge went on to provide just such a reason: "[Profit] was ... the person that held up everyone for 45 minutes this morning when he was late to appear without explanation .... I simply don't find a pattern yet, but I'm sensitive to it, aware of it, and we will proceed from here." 2Tr. 380.

The court, having thus disposed of Vega's objection under *Batson*, continued with the third round of strikes. Prosecutor Leventhal's next strike was against Sandra Johnson ("Johnson"), who is African-American. Vega again raised a *Batson* challenge. 2Tr. 391-92. As defense counsel Latimer argued, "If you put [Johnson] onto the numbers that I have already cited, I think a pattern is certainly demonstrated." 2Tr. 392. Latimer added that in his view, Johnson's

24

answers on *voir dire* had given no indication that she could not be a fair and impartial juror, and that, "at best she seems to be slightly confused." *Id.* The court opined that "it was very difficult to get any kind of response out of [Johnson]" and asked, rhetorically, "Does anyone want a confused juror?" 2Tr. 292-93. The trial judge went on to rule that Vega had not made the required *prima facie* showing with respect to Johnson based on the difficulty the court perceived in "get[ting] any kind of response from her." 2Tr. 393. In the fourth and fifth rounds, the prosecutor struck two more prospective jurors. The record does not reflect the race of either one, and Vega did not renew his *Batson* challenge.

As summarized above, the record reflects that the trial judge did not find Vega to have made a *prima facie* showing of discrimination by pointing to the prosecutor's use of peremptory strikes against nine African-Americans – or 75 percent of his strikes, in a pool that was described without disagreement as having an African-American population of approximately 25 percent. In contrast, when the prosecutor objected under *Batson* to two of Vega's peremptory strikes, the judge did conclude that the prosecutor had made a *prima facie* showing of discrimination. Specifically, upon the prosecutor's first such objection – made in the fourth round of strikes, at which point Vega had used all three of the strikes he had exercised thus far against white women – the judge ruled that a *prima facie* showing had been made, but ultimately denied the prosecutor's objection. 2Tr. 510, 521.

The prosecutor made another *Batson* objection after Vega's next strike of a white woman – the fourth such strike out of a total of five exercised thus far – and the trial judge again found that there was a *prima facie* showing of discrimination. Latimer sought to explain the latter strike on the ground that the stricken juror had described her previous jury service as "a negative

experience" because it had been "rather lengthy" and went on to express his concern "that a time period like that again would enure to our disadvantage as opposed to being impartial."  2Tr. 524-25.  The trial judge found Latimer's explanation to be pretextual, sustained the prosecutor's *Batson* objection, and seated the juror whom Vega had attempted to strike.  2Tr. 526.[10]

       2.   Analysis

          a.   Step One:  The *Prima Facie* Showing Of Discrimination

The defendant's burden to make a *prima facie* showing of discrimination at the first stage of the *Batson* inquiry is not an onerous one.  *Sorto v. Herbert*, 497 F.3d 163, 170 (2d Cir. 2007) (citing *Johnson*, 545 U.S. at 170).  A defendant can meet his burden at this stage "by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'"  *Johnson,* 545 U.S. at 169 (quoting *Batson*, 476 U.S. at 94) (footnote omitted).  These circumstances can include, but are not limited to, a demonstration of statistical evidence of disparate strikes of jurors of a certain group.  There is "no doubt that statistics, alone and without more, can, in appropriate circumstances, be sufficient to establish the requisite *prima facie* showing."  *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir. 2002).

A defendant can establish such statistical evidence by citing the "exclusion rate" – the number of strikes against members of a group compared to the number of potential jurors of that group on the panel – to show that the prosecutor is using strikes against all or most of the prospective jurors in a given group.  *Jones v. West*, 555 F.3d 90, 97-98 (2d Cir. 2009); *Tankleff*, 135 F.3d at 249 ("[T]he fact that the government tried to strike the only three blacks who were on

---

[10]  Vega's petition does not challenge the trial court's rulings on the prosecutor's objections under *Batson*.  I include a description of the facts surrounding those rulings to provide context for my analysis of the challenged rulings on Vega's own objections under *Batson*.

the panel constitutes a sufficiently dramatic pattern of actions to make out a prima facie case."). A defendant can also make a statistical showing on the basis of a "challenge rate" – the percentage of strikes against potential jurors of a particular group compared to that group's percentage on the panel – that demonstrates the "rate of minority challenges [is] significantly higher than the minority percentage of the venire[.]" *United States v. Alvarado*, 923 F.2d 253, 255-56 (2d Cir. 1991) ("*Alvarado II*"). In addition, "the prosecutor's questions and statements during the *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Batson*, 476 U.S. at 97.

The threshold determination of whether a defendant has made a *prima facie* showing of discrimination requires the resolution of a mixed question of law and fact. *United States v. Alvarado*, 891 F.2d 439, 443 (2d Cir. 1989) ("*Alvarado I*"), *vacated on other grounds by*, 497 U.S. 543 (1990). Accordingly, a court reviewing such a determination in a habeas case must consider whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Overton*, 295 F.3d at 277 (quoting 28 U.S.C. § 2254(d)(1)). A state court decision involves an "unreasonable application" of clearly established federal law when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Dunlap v. Burge*, 583 F.3d 160, 164 (2d Cir. 2009) (quoting *Williams*, 529 U.S. at 413). The standard requires "some increment of incorrectness beyond error[,]" *Sorto*, 497 F.3d at 169, but that increment "need not be [so] great ... as to suggest judicial incompetence." *Jones*, 555 F.3d at 96 (quoting *Overton*, 295 F.3d at 277).

Viewed against this legal backdrop, the trial court's handling of Vega's objections under *Batson* plainly qualifies as an unreasonable application of federal law for several reasons, as does the state appellate court's ruling that "there are no facts in the record supporting a prima facie case" of discrimination. *Vega*, 805 N.Y.S.2d at 642. Briefly stated, the state courts should have recognized that Vega had made a statistical showing that clearly met his burden at the first stage of the *Batson* inquiry.

The record reflects that African-Americans comprised approximately 25 percent of the venire for Vega's second trial.[11] When Vega raised his first *Batson* objection, the prosecutor had used seven of his eleven strikes against such jurors, for a challenge rate of 64 percent; that challenge rate rose to 67 percent when Vega made a further *Batson* objection following the prosecutor's next strike.[12] This "challenge rate" is significantly greater than twice the percentage of African-Americans in the venire. "A challenge rate nearly twice the likely minority percentage of the venire strongly supports a *prima facie* case under *Batson*." *Alvarado II*, 923 F.2d at 255-

---

[11] The source of that estimate is the rough approximation made by Vega's counsel at the time of his first *Batson* objection. Although the trial judge did not endorse it as being correct, neither he nor the prosecutor disagreed with the estimate. The estimate is also roughly consistent with local population statistics, and I therefore presume it to be sufficiently reliable for purposes of this analysis. I also respectfully recommend that this court take judicial notice of the fact that census statistics for the year 2000 show that African-Americans accounted for 19% of the population of Queens County. 2000 Census SF1 Population Division - New York City Department of City Planning (October 2004) (reporting that African-Americans accounted for 19 percent of the population of Queens County in 2000); *see Alvarado II*, 923 F.2d at 256 (taking judicial notice of population statistics and accepting them as a proxy for corresponding statistics about the venire). *Greene v. Travis*, 2003 WL 23198761, at *9 (E.D.N.Y. Dec. 2, 2003) (same).

[12] In calculating the prosecutor's challenge rate, I accept the prosecutor's contention that prospective juror Roldan was not African-American. Accepting Vega's view that the prosecutor's strike of that juror should be included in the calculation, the challenge rate was 72 percent at the time of the first objection and 75 percent at the time of the second.

56; *cf. Brown v. Alexander*, 543 F.3d 94, 101 (2d Cir. 2008) (a challenge rate of 88 percent, compared to a venire in which 63 percent of the members were African-Americans, did not support a *prima facie* case of discrimination). That statistic alone sufficed to establish a *prima facie* case of discrimination. *Overton,* 295 F.3d at 275; *see also Tankleff*, 135 F.3d at 249.

Although the challenge rate itself should have prompted the trial judge to proceed to the second step of the *Batson* inquiry, Vega's objection did not rest solely on that statistic. Latimer also relied on the prosecutor's "pattern" of front-loading the strikes: specifically, he noted that the prosecutor exercised six of his first seven strikes against African-Americans (among whom he included Roldan). 2Tr. 374. *See Harris v. Kuhlmann*, 346 F.3d 330, 345 (2d Cir. 2003) (pattern of strikes among the factors that can lead to an inference of discrimination); *Tankleff*, 135 F.3d at 249 (same).

The well-developed factual record of this case includes "the composition of the venire, the [prosecutor's] use of peremptory challenges, the race of the potential jurors stricken, ... a clear indication as to which strikes were challenged when and on what ground, and which strikes were cited to the trial court as evidence of a discriminatory intent." *Sorto*, 497 F.3d at 171-72. That record was plainly sufficient to establish a *prima facie* showing of discrimination. It was an unreasonable application of *Batson* for the trial court to decline to proceed to the second stage of the inquiry, and an equally unreasonable application of federal law for the appellate court to affirm that decision.

The trial court compounded the error by conflating the inquiry into the reasons for the prosecutor's strikes with the inquiry into whether those strikes should be explained – and then compounded the error again by substituting its own conjecture for the prosecutor's reasons. Each

misstep was an unreasonable application of *Batson*. First, by assessing the reason for the strike as part of its determination of whether Vega had made a *prima facie* showing of discrimination, the trial court impermissibly increased Vega's burden at that first stage of the *Batson* inquiry. "It is not until the *third* step that the persuasiveness of the justification becomes relevant – the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (emphasis in original). This error had the effect of undermining what should have been a strong *prima facie* case of discrimination. The danger inherent in this approach is amply illustrated by the result in this case: based on its surmise that the prosecutor had a race-neutral reason to strike prospective jurors Armstrong, Francisco, Profit, and Johnson, the court concluded that Vega had failed to make a *prima facie* showing of discrimination, *see* 2Tr. 379, 393, and therefore did not require the prosecutor to explain his strikes against four other African-American prospective jurors (Polk, Jackson, Holland, and Dorleans). By resolving the *Batson* challenge in this way, the court created an impermissible risk that one or more jurors had been stricken on the basis of race. *See Walker v. Girdich*, 410 F.3d 120, 123 (2d Cir. 2005) ("striking even a single juror for a discriminatory purpose is unconstitutional").

Second, the trial court's approach to Vega's objections included a method of analysis that is not permissible at any stage of the *Batson* inquiry: its own conjecture about the prosecutor's reasons for exercising strikes. *Batson* does not excuse a race-motivated strike simply because the record reflects an objective reason that could prompt a fair prosecutor to excuse a juror; it instead focuses on the prosecutor's subjective intent. By identifying the reasons why, in his view, the prosecutor might have stricken some of the jurors, the trial judge not only failed to provide a

30

record of the prosecutor's actual reasons, he affirmatively muddied that record by providing a statement of reasons that he would find acceptable – thereby undermining the reliability of any later statement by the prosecutor.[13] *See Johnson*, 545 U.S. at 172 ("speculation 'does not aid our inquiry into the reasons the prosecutor actually harbored' for a peremptory strike") (quoting *Holloway v. Horn*, 355 F.3d 707, 725 (3d Cir. 2004)). After conflating the first step of *Batson* with the third, the trial judge skipped the second step entirely and supplied his own "race-neutral" reasons for the strikes, which he then proceeded to evaluate for credibility in step three. *Cf. Hernandez v. New York*, 500 U.S. 352, 359 (1991) (where *prosecutor* had, without prompting from the court, offered race-neutral explanations for all peremptory challenges for which *Batson* claim was pursued, "the preliminary issue of whether the defendant had made a prima facie showing becomes moot").

b.    Step Two:  The Prosecutor's Proffered Reasons

For the reasons set forth above, I conclude that Vega has met his burden of demonstrating that the state courts unreasonably applied *Batson* in rejecting the claim that he was denied the equal protection of law during the jury selection process. That conclusion, however, does not necessarily compel the further conclusion that Vega is entitled to either release or a new trial. A federal court reviewing a conviction on a habeas petition has several options upon finding such a *Batson* violation:  it can, of course, order a new trial in appropriate circumstances, but it can also grant a conditional writ of habeas corpus and return the case to the state court for a reconstruction hearing, or it can convene such a hearing itself. *Kulhmann*, 346 F.3d at 347 (internal quotations

---

[13]  While I recognize the risk, I am satisfied that it was not realized here.  Based on the content of Leventhal's testimony and his demeanor in providing it, I conclude that he did not tailor his testimony to reflect the trial judge's assessment of the stricken jurors.

and citations omitted). Because I concluded that recommending the first option would carry the risk of a windfall to Vega and that recommending the second would occasion needless delay, I convened a reconstruction hearing in the interest of completing the record and providing the court with a full analysis of the merits of Vega's petition. As a result, the record now includes the trial prosecutor's proffered race-neutral reasons for each of the peremptory strikes at issue.

At the reconstruction hearing, prosecutor Leventhal testified on the basis of his recollection of Vega's trial, as refreshed by his review of his own contemporaneous notes of the *voir dire*, a copy of Latimer's *voir dire* notes, the transcript of those proceedings, and also additional notes that he created in preparation for the reconstruction hearing. HT 9-13, 37-39. Before providing his explanations of specific peremptory challenges, Leventhal discussed aspects of the case that affected his overall approach to selecting jurors for Vega's second trial.

Leventhal testified that after Vega's first trial ended in a hung jury, he learned that one or two of the jurors in that trial had refused to deliberate for reasons that appeared to conflict with statements they had made during the *voir dire* process. HT 6-7.[14] In addition to having a heightened concern about securing clear answers from prospective jurors as a result of the outcome of the first trial, Leventhal sought to identify jurors who would not balk at relying on prosecution witnesses who anticipated leniency for their own crimes in exchange for testimony as well as witnesses with histories of drug use and other illicit activities. HT 7. Finally, Leventhal believed that Vega may have associated with members of organized crime groups, and

---

[14] No party questioned Leventhal about the source of that information.

therefore sought to avoid empaneling jurors who might be particularly vulnerable to intimidation and tampering. HT 7-8.[15]

Based on these concerns and his assessment of the responses given by prospective jurors to questions asked of them during the *voir dire* process, Leventhal testified that he exercised peremptory challenges against specific members of the venire for the following reasons:

James Polk: Leventhal noted that Polk had been arrested about two years before Vega's trial for bringing a razor blade into a corrections facility. Polk explained that he was not aware that he had the razor blade with him at the time of his arrest, but nevertheless pleaded guilty to a reduced charge because "he just didn't want to keep coming back to court." When asked to describe the charges to which he had confessed, Polk responded, "blah blah blah." Leventhal further remarked on the fact that Polk's brother was then facing pending criminal charges. HT 13-14. Leventhal explained that he struck Polk because he did not seem particularly credible, and because his statements concerning his criminal case suggested that he did not "take things very seriously[.]" HT 18-19.

Antonio Roldan: Leventhal cited Roldan's statement that "he doesn't know anybody who gets on the witness stand who tells the truth." HT 20. Because Leventhal's case relied on Vega's statements and admissions to witnesses, some of whom were to testify in exchange for a benefit from the prosecutors' office, Leventhal feared that Roldan would not be receptive to the prosecution's evidence. HT 20-21.

Jennifer Jackson: Jackson stated that she believed she could not convict a defendant based solely on the defendant's own words, and that she needed an eyewitness or additional evidence. Leventhal did not want Jackson on the jury because his case was built on evidence of Vega's statements. HT 22-23.

Alise Francisco: Leventhal perceived Francisco to be "very inarticulate" and "very confused." HT24. He said that she was unable to answer the court's questions about prior jury service and seemed to misunderstand its questions about her nationality and the number of years she had been in the United States. HT 24-25. Leventhal also characterized as inconsistent Francisco's answers to questions by Vega's counsel about how she would go about determining the credibility of a witness who hoped to exchange testimony for leniency. As a result, Leventhal said he struck Francisco because he feared

---

[15] As discussed below, I generally found Leventhal to be a credible witness. In making that finding, however, I emphasize that I have no reason to conclude that Leventhal's concerns were objectively reasonable or not. In particular, I make no determination as to whether Vega had any association with members of organized crime groups.

she would be unable to follow "complicated legal instructions" about witness credibility determinations or to comprehend his evidence. HT 27.

Tammy Holland: Leventhal cited Holland's statement that being a juror was too much responsibility for her. Because he believed that one or two jurors in Vega's first trial had refused to deliberate, Leventhal did not want Holland on the jury at the second trial. Accordingly, after his motion to excuse Holland for cause was denied, Leventhal exercised a peremptory challenge against her. HT 28-29.

Adam Profit: Leventhal said he exercised a strike against Profit because of his apparent disregard for the court's instructions. First, he arrived late on the second day of jury selection and did not appear apologetic for delaying the proceedings for nearly an hour. HT 31. Second, contrary to the court's instruction that all jurors should provide only generalized information about their residences and places of employment (an order that was designed to assuage concerns about potential juror intimidation), Profit provided both his home address and his specific place of employment. HT 34.

Joy Dorleans: Leventhal recalled that Dorleans expressed discomfort about the prospect of serving as a juror, asking, "Who am I to judge?" and noting that it would be "too much responsibility" for her. HT 35, 37. As with Holland, Leventhal struck this juror only after the court denied his motion to excuse her for cause. HT 40.[16]

Cathy Armstrong: Leventhal noted that Armstrong expressed the view that it was inappropriate for a witness to receive, or to be offered, a benefit in exchange for cooperation and that she would be unsure if such a witness was telling the truth. As with Roldan, who had expressed a similar view, Leventhal feared that Armstrong would not be receptive to the kind of evidence he planned to offer against Vega. HT 42-43.

Sandra Johnson: Leventhal perceived Johnson as "angry" and felt she had "an animus" against him or the prosecution. HT 44. Moreover, she repeatedly expressed concern about her ability to be fair and uncertainty about her ability to handle the responsibility of being a juror. Here again, Leventhal exercised a strike only after the court denied his challenge for cause. HT 44-45.

At this stage of the *Batson* inquiry, the court's task is not to assess credibility, but simply

to determine whether the prosecutor proffered "'clear and reasonably specific' race-neutral

explanations" for the peremptory challenges at issue. *Brown v. Kelly*, 973 F.2d 116, 120 (2d Cir.

---

[16] Leventhal noted that the same concern prompted him to strike two other jurors as well, neither of whom was African-American. HT 36-37.

1992) (citing *Batson*, 476 U.S. at 97-98 & n.20).[17]  I conclude that he did, and therefore proceed to the third stage of the *Batson* inquiry.

c.    Step Three:  Assessment

Once the defendant has established a *prima facie* case of discrimination and the prosecutor has responded with a race-neutral explanation for its strikes, the court must determine whether the defendant has carried his burden of proving purposeful discrimination.  *Batson*, 476 U.S. at 98.  The "critical question" at this stage of the *Batson* protocol is determining "the persuasiveness of the justification" proffered by the prosecutor.  *Miller-El v. Cockrell*, 537 U.S. 322, 338-39 (2003).  Because the evidence on this issue is often vague or ambiguous, "the best evidence often will be the demeanor of the attorney who exercises the challenge."  *Hernandez*, 500 U.S. at 365.  Thus, "evaluation of the prosecutor's state of mind based on [his or her] demeanor and credibility lies 'peculiarly within a trial judge's province.'"  *Id.* (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).

In *Miller-El*, the Supreme Court set forth a non-exhaustive list of factors to be considered in determining whether a race-neutral explanation is pretextual.  These factors include the demeanor of the attorney offering the explanation, the reasonableness of the explanation, and whether the explanation has some basis in accepted trial strategy.  537 U.S. at 339.  Another factor to be taken into account is the amount of time which has passed since the prosecutor made the strike at issue, which might render efforts to reconstruct the proceedings "subject to the usual risks of imprecision and distortion from the passage of time."  *Id.* at 343.  The "credibility of the

---

[17]  Because credibility is not an issue at this stage of the inquiry, I defer to the following part of the discussion any description of Vega's attempt to impeach Leventhal on cross-examination.

prosecutor's explanation is much weakened" where there are similarities between those jurors who were struck and those jurors who were accepted, and the principal difference is race. *United States v. Thomas*, 303 F.3d 138, 145 (2d Cir. 2002) (citation omitted). Moreover, the court's third stage consideration "can be supported by any evidence demonstrating that, despite the neutral explanation of the prosecution, the peremptory strikes in the final analysis were race based" which "includes the facts and circumstances that were adduced in support of the prima facie case." *Miller-El*, 537 U.S. at 340.

Vega challenged Leventhal's proffered explanation both in cross-examination and in a post-hearing submission. On cross-examination, Vega's counsel sought to impeach Leventhal with evidence about prospective jurors who were not African-American and whom he had not stricken despite giving answers that were purportedly similar to those Leventhal had cited to explain the strikes at issue. In particular, the cross-examination focused on prospective jurors Noni Rallis ("Rallis") and Eric Mazzini ("Mazzini"). Rallis had been convicted of bringing three marijuana cigarettes into the country when she returned from a vacation in Jamaica eleven years prior to Vega's trial. HT 48. Leventhal distinguished Rallis from the prospective jurors he had stricken by noting that she had pleaded no-contest to the charge against her and had indicated an ability to take the proceedings seriously, as evidenced by her statement that it would be an honor to serve as a juror. HT 49. Mazzini, like some of the stricken prospective jurors, had expressed a view that witnesses should not should receive a benefit for testifying. HT 51-52. Leventhal explained his failure to strike Mazzini by citing Mazzini's statement that he would be able to follow the court's instructions in judging the reliability and credibility of witnesses and

Leventhal's own subjective perception, based on the "totality of his answers[,]" that Mazzini would serve with an open mind. HT 54.

In his post-hearing submission, Vega focuses his argument on the perceived flaws in Leventhal's explanations for the strikes at issue here. He describes Leventhal's explanations concerning Roldan and Francisco as "particularly troubling." Supp. Memo. at 15.[18] Vega asserts that Leventhal mischaracterized Roldan's statements on *voir dire* and contends that those statements do not "suggest an intransigent or biased juror" but rather a juror who agreed that providing benefits to a witness was a "good idea" while merely recognizing that a benefit could possibly impact a witness's testimony. *Id.* at 15-16; *see* HT 20. Vega goes on to argue that Leventhal's failure to seek to challenge Roldan for cause undermines the credibility of his explanation of the strike. Supp. Memo. at 16. With respect to Francisco, Vega contends that the record does not support Leventhal's perception that she exhibited confusion and cites her answer concerning witnesses who receive benefits for testifying – which was favorable to the prosecution – as evidence that Leventhal's explanation was pretextual. *Id.* at 16-17.

I conclude that Vega's arguments are wholly unpersuasive. Any attempt to equate Rallis with the stricken prospective jurors seems almost willfully obtuse, as does the argument that the failure to make a challenge for cause against Roldan – a challenge that would plainly have failed – undermines the credibility of Leventhal's explanation for striking that prospective juror. Vega's

---

[18] The respondent contends that the strikes of these two jurors should not be considered as part of Vega's *Batson* challenge because, in his view, the record does not support the proposition that either of them was African-American. Because I conclude that Vega is entitled to no relief regardless of the outcome of that dispute, I recommend that the court should not attempt to resolve it.

attempts to parse the answers given by Mazzini and Francisco display a similar unwillingness to accept the proper limits of the court's role at the third stage of the *Batson* inquiry.

The court's task is to determine whether Vega has demonstrated that Leventhal's explanation of his subjective reasons for exercising his strikes was truthful – it is not to determine whether those strikes were strategically sound or that they reflected a meticulous consistency that can withstand retrospective scrutiny. Having had the opportunity to consider both the content of Leventhal's testimony and his demeanor in providing it, I am confident that whatever the wisdom of his choices in exercising peremptory challenges, he did not make any decision on the basis of a prospective juror's race. To the contrary, I conclude that Leventhal's proffered race-neutral explanations were both reasonable and consistent with an accepted trial strategy.

Leventhal gave three types of explanations for his challenges. First, he said he struck four jurors – Polk, Profit, Francisco, and Johnson – on the basis of their behavior and demeanor in the *voir dire* process itself. His testimony in that regard was credible, and reflected a lawful, race-neutral decision. *See*, *e.g.*, *Brown*, 973 F.2d at 121 (upholding peremptory challenges based on prosecutor's perception of one juror's timidity and nervousness, another juror's flippant answers and flirtatious manner with defense counsel, and a third juror's hostility and unresponsiveness); *see also Messiah v. Duncan*, 435 F.3d 186, 200-01 (2d Cir. 2006) (upholding peremptory challenge due partially to juror's "inattentiveness during voir dire – he was reported to be reading the newspaper"); *Green v. Travis*, 414 F.3d 288, 300 (2d Cir. 2005) (a prospective juror's "unfavorable demeanor" is a valid race-neutral explanation for a peremptory challenge).

38

Second, Leventhal justified two of his strikes – against Holland and Dorleans – by referring to their expressions of apprehension about serving as a juror.  Here again, I found his testimony credible, and in light of the history of the litigation particularly reasonable.  It is also a perfectly valid, race-neutral reason to strike the prospective jurors.  *See Bryant v. Speckard*, 131 F.3d 1076, 1078 (2d Cir. 1997) (upholding peremptory challenges based on juror's "reservations and apprehensions about serving").

Finally, Leventhal's explanation for striking three prospective jurors – Roldan, Jackson, and Armstrong – focused on their perceived views about a particular form of evidence upon which the prosecution of Vega would heavily rely.  Notwithstanding Vega's attempt to impeach that testimony, I found it credible, and it is plainly the kind of strategic decision that lawyers are entitled to make in exercising peremptory challenges.  *See, e.g., United States v. Price*, 2009 WL 973370, at *4 (E.D.N.Y. Apr. 10, 2009) (quoting *Miller-El*, 537 U.S. at 339); *Palmer v. Greiner*, 2003 WL 22019740, at *7 (S.D.N.Y. Aug. 22, 2003).

Thus, while Vega has demonstrated that the state courts unreasonably applied *Batson* at his trial and on appeal, he has not demonstrated that he is in state custody as the result of a deprivation of the right to equal protection that *Batson* safeguards.  As a result, he is entitled to no more relief than he has already received in the form of a reconstruction hearing.  I therefore respectfully recommend that the court reject his *Batson* claim.

III.    Recommendation

For the reasons set forth above, I respectfully recommend that the court deny in its entirety petitioner Henry Vega's request for a writ of habeas corpus.

IV.     Objections

Any objections to this Report and Recommendation must be filed with the Clerk no later than May 10, 2010.  Failure to file objections within this period designating the particular issues to be reviewed waives the right to appeal the district court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Governing Section 2254 Cases in the United States District Courts 8(b); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

**SO ORDERED.**

Dated: Brooklyn, New York
        April 22, 2010

                                                    /s/ James Orenstein
                                                    JAMES ORENSTEIN
                                                    U.S. Magistrate Judge